******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

MCDONALD, J., with whom PALMER, MULLINS, KAHN and ECKER, Js., join, concurring. I agree with and join the majority opinion but write separately to address two concerns. First, the unusual posture of this case as it ultimately was presented to this court required resolution of a narrow question that leaves several significant questions unanswered regarding the intersection of trusts and conservatorships. This is unfortunate, and I take this opportunity to explain why these questions, had they been properly presented in this case, might have compelled a different outcome than the one the majority reaches today. Second, this case reveals the need for legislative review of voluntary conservatorships, which were not a focus of the 2007 legislative reforms. See Public Acts 2007, No. 07-116. I therefore take this opportunity to draw attention to this matter so that the legislature is on notice about these potential policy matters.

I

I begin by making clear what this court does and does not decide in the present case. The *only* question before this court is whether a voluntary conservatorship creates a relationship of joint authority, such that a voluntarily conserved[1] person may continue to manage her affairs as she is able. It is on this basis that the defendant First State Fiduciaries, LLC, challenges the Appellate Court's conclusion that Susan D. Elia lacked the legal authority to create the Delaware irrevocable trust. It is important to underscore that the Appellate Court's holding, and, in turn, this certified appeal, rests on an unchallenged assumption, namely, that the former conservator of Elia's estate, Renee F. Seblatnigg, had the authority to create the Delaware irrevocable trust, subject to meeting the conditions prescribed in General Statutes (Rev. to 2011) § 45a-655 (e). After all, if the conservator lacked such authority, there would be no issue of joint authority. If we were so permitted, there would be several reasons to question this assumption, which appears to be the sole impediment to Elia's legal authority to create the irrevocable trust.

The majority opinion recognizes that involuntarily conserved persons have the statutory right to retain exclusive authority over those matters that they are capable of managing, with or without support from a source other than a conservatorship. See General Statutes (Rev. to 2011) § 45a-650 (k) and (*l*) (now § 45a-650 (*l*) and (m), respectively). The statutory scheme suggests; see General Statutes (Rev. to 2011) § 45a-646; and logic dictates that voluntarily conserved persons similarly can obtain a limited conservatorship. They may do so by simply designating in their application for voluntary representation which specific matters

should be delegated to the conservator, thus retaining exclusive authority over all undesignated matters.[2] The standard Probate Court form for such applications provides a field to make such limited designations. See Petition/Voluntary Representation by Conservator, Form PC-301, p. 2 (last modified January, 2021), available at www.ctprobate.gov/Forms/PC-301.pdf (last visited January 20, 2022) ("I would like a conservator appointed to assist me with the following financial matters"). Elia did not make such a limited designation in her application.

There would be no need for Elia to make such a limited designation, however, if her broad grant of authority to manage her estate did not include the authority to create the irrevocable trust and to fund it with a transfer of funds from her revocable trust. Two theories might support such a proposition.

First, certain matters cannot be delegated to the conservator. See, e.g., 39 Am. Jur. 2d 113, Guardian and Ward § 117 (2008) ("[a]s a general rule, a guardian may not waive legal rights on behalf of [the guardian's] ward, surrender or impair rights vested in the ward or impose any legal burden thereon, or exercise purely personal elective rights of [the guardian's] ward" (footnotes omitted)); see also, e.g., *Newman* v. *Newman*, 42 Ill. App. 2d 203, 213, 191 N.E.2d 614 (1963) ("certain powers, rights, or elections may be so personal that they cannot be exercised on behalf of an incompetent [by a conservator]"); *Estate of Townson ex rel. East Tennessee Human Resources Agency* v. *Estate of East ex rel. Cooley*, 297 S.W.3d 736, 738 (Tenn. App. 2009) (conservator "has no authority to exercise an elective right or power of the conservatee" (internal quotation marks omitted)), appeal denied, Tennessee Supreme Court, Docket No. E2008-00689-SC-R11-CV (August 31, 2009).

The execution of a testamentary instrument, designating how and to whom the conserved person's assets will be distributed upon his or her death, is one such matter. See generally 1 Restatement (Third), Trusts § 11, comments (a) through (d), pp. 160–62 (2003) (addressing testamentary capacity of persons under conservatorship). Authority to make testamentary dispositions for the conserved person cannot be delegated to the conservator both because such rights are purely personal and because the conservator's authority extends only to the lifetime interests (support and care) of the conserved person. See, e.g., *Citizens State Bank & Trust Co. of Hiawatha* v. *Nolte*, 226 Kan. 443, 449, 601 P.2d 1110 (1979) ("[A conservator's duty] is to manage the estate during the conservatee's lifetime. It is not his function, [or] that of the [P]robate [C]ourt supervising the conservatorship, to control disposition of the conservatee's property after death."); *In re Estate of Briley*, 16 Kan. App. 2d 546, 549, 825 P.2d 1181 (1992) (recognizing that right to change beneficiary of account

"is a purely personal elective right of the conservatee" and that "[t]he decision regarding distribution of the conservatee's property after death belongs to the conservatee"); see also, e.g., *In re Estate of Garrett*, 81 Ark. App. 212, 218, 100 S.W.3d 72 (2003) (stating that will making requires " 'personal performance' " and thus cannot be delegated).

The majority properly declines to address whether Elia had the testamentary capacity to create the irrevocable trust because that issue was neither preserved[3] nor adequately briefed. See footnote 18 of the majority opinion and accompanying text. Review of the trial court record reveals that the irrevocable trust is not, strictly speaking, a testamentary trust. It was not created by a will; see, e.g., 1 Restatement (Third), supra, § 17, p. 250; see also, e.g., Public Acts 2021, No. 21-39, § 1 (effective January 1, 2022), to be codified at General Statutes (Supp. 2022) § 45a-499c (29); and it vested discretion in the trustees to make distributions in any amount during Elia's lifetime to Elia, her grandchildren, or any charitable institute. See, e.g., *Cate-Schweyen* v. *Cate*, 303 Mont. 232, 239–40, 15 P.3d 467 (2000) ("A testamentary trust . . . not only must comply with the statutory requirements for a will, but also must take effect only upon the testator's death. . . . Therefore, a testamentary disposition is usually incompatible with a trust established by a trustor who retains a life interest, as a beneficiary of the trust, although a new beneficiary or beneficiaries acquire an interest upon the trustor's death." (Citations omitted; internal quotation marks omitted.)) Whether such a trust should be characterized for present purposes as a purely testamentary act, a partially testamentary act requiring concurrent action by the conservator and conserved person, or not a testamentary act at all is a difficult issue best left to a case in which it is the subject of adversarial briefing. The unfortunate effect of the present case is that Elia may have had testamentary capacity when she created the irrevocable trust and, yet, her trust assets will not be distributed in accordance with her wishes following her death, which occurred during the pendency of this appeal.

The second theory that might excuse the need for Elia to make a limited designation of authority to her conservator to reserve her right to create the irrevocable trust would depend on whether such a right is encompassed in the authority to manage the conserved person's "estate." General Statutes (Rev. to 2011) § 45a-655 (a). If a conserved person's present interest in a trust is not part of the conservatorship estate, a good argument could be made that Elia retained the authority to create and fund a trust, as long as she did not use assets of her estate to do so.[4] In the absence of evidence that Elia lacked the mental capacity to make decisions with regard to her trusts, she would retain the legal capacity to revoke or modify the Connecticut revocable

trust, to create the Delaware irrevocable trust, and to request that the trustee of her revocable trust—who also happened to be her conservator—transfer funds to the irrevocable trust.

This theory finds some support in both the statutory text and case law.[5] The only explicit discussion of trusts in the conservatorship scheme is in General Statutes (Rev. to 2011) § 45a-655 (e). That subsection prescribes conditions for "transfers of income and principal from" the conserved person's estate to a trust, existing or created by the conservator. General Statutes (Rev. to 2011) § 45a-655 (e). The word "from" suggests that the transfer depletes assets of the estate by directing them to a source outside the estate. If an existing trust or a new trust created by the conservator into which income was transferred was part of the estate, the transfer would be "within" or "to" the estate, not "from" the estate.[6]

This court's decision in *Dept. of Social Services* v. *Saunders*, 247 Conn. 686, 724 A.2d 1093 (1999), lends support to this view. The issue in that case was "whether the Probate Court was authorized to permit a conservatrix to establish an irrevocable inter vivos trust funded with the net proceeds recovered in the settlement of a negligence action filed on her ward's behalf, which would not be considered an available resource for the purpose of determining ongoing [M]edicaid eligibility." Id., 687. The Superior Court decision answering that question in the negative, which this court reversed on appeal, was in fact the impetus for the 1998 amendment to General Statutes (Rev. to 1997) § 45a-655 (e) expressly authorizing such an act. See id., 697, 702–704, 715. This court's decision in *Saunders* is noteworthy for its recognition of the effect of the transfer on the estate and on the conservator's control of the transferred assets. The plaintiff department characterized the transfer into the trust as an act that had "divest[ed] the estate by transferring its assets to an inter vivos trustee"; id., 709; and "eliminate[d] [the ward's] estate in its entirety and transfer[red] it to a trustee." (Internal quotation marks omitted.) Id. The court in *Saunders* accepted this premise but nonetheless viewed the Probate Court's permission for the conservator to create the trust to be a proper exercise of that court's authority because the trust assets were still available for the ward's care and support through his exclusive equitable interest and that court would have jurisdiction over both the trustee and the conservator. See id., 709–12. In *Saunders*, this court also rejected the plaintiff department's argument that the transfer of the ward's assets to the trust "would constitute an improper delegation of the Probate Court's responsibility, acting through the conservator, to manage [the ward's] estate" because the Probate Court has "plenary authority to manage a ward's estate" but only limited authority to "review actions of a trustee of an inter vivos trust . . . ." Id., 710. This court

acknowledged that the conservator's authority in relation to the trust would be limited to the management of funds distributed by the trustees, who would actually manage the trust in accordance with the terms of the trust instrument.[7] See id., 710–11; see, e.g., *Ramsdell* v. *Union Trust Co.*, 202 Conn. 57, 70, 519 A.2d 1185 (1987) ("the duties of the conservator and those of the trustees, and the potential liabilities arising from the breaches of these duties, are completely distinct"); see also, e.g., 1 Restatement (Second), Trusts § 175, comment (f), p. 381 (1959) ("[t]he duty of the trustee is not only to take and keep control, but to take and keep exclusive control"); R. Folsom & L. Beck, Connecticut Estates Practice Series: Drafting Trusts in Connecticut (2d Ed. 2021) § 1:15, p. 16 (explaining that statutes and legal principles "[suggest] that the [c]onservator should not have authority to exercise the [g]rantor's right to revoke or amend the trust").

There may well be persuasive counterarguments. The questions of whether trusts are part of the estate, subject to the conservator's management, and, if not, whether Elia retained the legal authority to create the irrevocable trust are not, however, properly before this court. The defendant did argue before the Appellate Court that the assets in the revocable trust were not part of the conservatorship estate but made no argument that this fact had any bearing on the question of Elia's legal authority to create the irrevocable trust. See *Day* v. *Seblatnigg*, 186 Conn. App. 482, 506 n.10, 199 A.3d 1103 (2018). The Appellate Court reasonably construed the defendant's argument to be related exclusively to the question of whether Seblatnigg had the legal authority to *transfer* the revocable trust assets and determined that it was unnecessary to address that argument in light of its conclusion that Elia lacked legal authority to *create* the irrevocable trust. See id. The defendant did not argue in its petition for certification to appeal to this court that the Appellate Court improperly had failed to reach this issue because it was directly connected to the question of whether Elia had authority to create the irrevocable trust.[8] We therefore must leave to another day the questions of whether trusts are part of the conservatorship estate and, if not, whether a conserved person retains exclusive authority to create and fund trusts with assets that are not part of the conservatorship estate.

## II

I also take this opportunity to highlight the possibility that the legislature may wish to consider revisions to the conservatorship scheme as it applies to voluntary representation, which was not directly considered in the 2007 reforms.

As the majority explains, it is not uncommon for persons seeking voluntary representation to have the same degree of incapacity as involuntarily conserved

persons, whether at the time the application is submitted or sometime thereafter. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 1, 1977 Sess., p. 190, testimony of Probate Judge Bernard F. Joy; see also, e.g., Public Acts 1987, No. 87-87. This fact would suggest that some members of the former class may be equally vulnerable to some of the abuses that prompted the 2007 reforms. Yet, because the statutory definition of a "conserved person" includes only involuntarily conserved persons; see General Statutes § 45a-644 (h); it appears that protections available in involuntary conservatorships are unavailable in voluntary conservatorships. Those protections include the right to clear notice of the legal consequences of the appointment of a conservatorship, including the fact that conserved persons "will lose some of [their] rights"; (internal quotation marks omitted) General Statutes § 45a-649 (b); the right to appointed counsel, the right to have the Probate Court ascertain whether the applicant has the capacity to retain certain rights, and the right to periodic judicial review of the conservatorship to ascertain whether the court should modify or terminate the conservatorship. See General Statutes §§ 45a-649 (d), 45a-649a, 45a-650 (m) and 45a-660 (c). The only right provided to the person in a proceeding for voluntary representation, other than to be present and heard, is that the court shall "[explain] to the [applicant] that granting the petition will subject the [applicant] or the [applicant's] property . . . to the authority of the conservator . . . ." General Statutes § 45a-646.

Perhaps not all of the procedural protections afforded to involuntarily conserved persons are necessary when the conservatorship is being requested, rather than imposed, and the voluntarily conserved person has the distinct right to terminate the conservatorship at will, with thirty days notice. See General Statutes § 45a-647. But the present case illustrates the pitfalls of the lack of any explicit procedural requirements. The Probate Court made no effort to ascertain what authority, if any, Elia wanted to retain or what limits, if any, she wanted to place on her conservatorship. The court's explanation of the legal consequences of the appointment of a conservator of Elia's estate; see footnote 13 of the majority opinion; could have misled Elia to believe that she retained authority over her entire estate and had given Seblatnigg authority only to act as her agent under a relationship of joint authority. Hopefully, this court's opinion in this case will provide clearer direction on that matter.

[1] For consistency with the majority opinion, I also refer to a voluntarily represented person as "voluntarily conserved," mindful that such persons do not fall within the definition of a conserved person and have not been found by a court to be incapable of managing their affairs. See General Statutes § 45a-644 (g) and (h); General Statutes (Rev. to 2011) § 45a-646.

[2] The exercise of such authority may nonetheless be rendered void if it is demonstrated that the voluntarily conserved person lacked the requisite mental capacity to undertake the act in question. See, e.g., 1 Restatement (Third), Trusts § 11, comment (e), pp. 162–63 (2003).

³ As the majority notes, the defendant had cast the question before the Appellate Court as a question of Elia's capacity to contract, and that court viewed it as such. See footnote 18 of the majority opinion. I note that there is authority indicating that the creation of a trust is not contractual in nature. See, e.g., *Tunick* v. *Tunick*, 201 Conn. App. 512, 525–26, 242 A.3d 1011 (2020), cert. denied, 336 Conn. 910, 244 A.3d 561 (2021); see also id. (citing authorities).

⁴ The defendant pointed out in its memorandum in support of its motion to strike the complaint filed by the plaintiff, Margaret E. Day, coconservator of Elia's estate, that the schedule to the trust instrument recited that $1 was the property conveyed to the irrevocable trust at the time of its establishment, and that the complaint made no allegation that this sum came from conservatorship estate assets. The trial court did not rule on this motion, filed well after the plaintiff filed her motion for summary judgment, and the defendant's appellate briefs appear to assume that the irrevocable trust was funded by a transfer from the revocable trust.

⁵ There is an indication in the trial court record that Elia and the Probate Court judge who granted her application for representation did not view the revocable trust to be part of the estate. One of the defendant's filings in opposition to the motion for summary judgment recited an exchange that purportedly occurred at a Probate Court hearing at which Elia's children unsuccessfully sought to have Elia found incapable of managing her affairs and involuntarily conserved. At that proceeding, a question was raised about the omission of Elia's revocable trust from Seblatnigg's inventory of the estate. Both the judge and Elia's counsel made comments indicating that they understood the revocable trust to be outside the conservatorship estate and, thus, properly excluded from the inventory required under § 45a-655 (a). The defendant did not renew this argument in its Appellate Court brief, and nothing in the record indicates how or whether the plaintiff responded to this argument before the trial court.

⁶ The trial court concluded that the revocable trust assets were part of the conservatorship estate, pointing to the conservator's duty under § 45a-655 (a) to include "equitable present interest[s]" in an inventory of the conserved person's estate and the uncontested fact that Elia held an equitable interest in the Connecticut revocable trust. Even if we assume that the conservator has the duty to include trust assets in the inventory, I do not view that fact as dispositive of the question of whether the trust is part of the estate, subject to the conservator's management. Cf. *In re Conservatorship of Addison* v. *Touchstone*, 242 So. 3d 926, 935–36 (Miss. App. 2018) ("joint accounts created prior to the [ward's] incapacity [are] not subject to being marshalled by the conservator, although the funds may be used if necessary to pay for the care and expenses of the ward during his lifetime" (internal quotation marks omitted)). If trusts are part of the estate, however, that would raise the question of whether a transfer of funds from one trust to another would be a transfer "from" the estate.

⁷ I am not suggesting that the conservator would lack authority to request a distribution from the trust for the conserved person's support in accordance with the terms of the trust or to file an action on the conserved person's behalf to compel the trustees to meet their fiduciary obligations.

⁸ The defendant petitioned this court for certification of two issues: (1) whether the Appellate Court correctly determined that Elia did not retain any control over her estate; and (2) whether "the *trial court* err[ed] when it concluded that [General Statutes (Rev. to 2011)] § 45a-655 (e), a statute directed solely to the conduct of conservators, applied to the conduct of a voluntarily conserved person." (Emphasis added.) We granted certification, limited to the first issue. See *Day* v. *Seblatnigg*, 331 Conn. 913, 204 A.3d 702 (2019); see also footnote 5 of the majority opinion (reframing certified question).